UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JEFFERY TODD BARNES,

                Petitioner,              Case No. 1:14-cv-742

v.                                   Honorable Robert J. Jonker

CATHLEEN STODDARD,

                Respondent.
_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jeffery Todd Barnes is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan. On April 29, 2004, following a three-day jury trial in the St. Joseph County Circuit Court, Petitioner was convicted of four counts of first-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520b, and one count of second-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520c. Petitioner has been sentenced and then resentenced a couple of times. The sentences he is presently serving—life imprisonment for each CSC-I conviction and 15 years to 22 years, 6 months for the CSC-III conviction—were imposed by the trial court on November 14, 2011.

      On July 7, 2014, Petitioner filed his habeas corpus petition. The petition included unexhausted claims. Petitioner immediately sought a stay to permit him to exhaust his state court remedies with regard to those issues. This Court granted that relief. Petitioner pursued his claims in the state courts. He filed an amended petition on November 16, 2021.

The amended petition raises five grounds for relief, as follows:

I.     Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel where defense counsel (A) failed to suppress Petitioner's post-arrest statement that was obtain[ed] in violation of his Fifth and Fourteenth Amendment right against self-incrimination, (B) failed to object to the improper hearsay statements that impermissibly bolstered the credibility of the complaining witness, (C) failed to properly handle expert witnesses, (D) failed to object to suppressed evidence, (E) failed to consult with or call an expert in the forensic interviewing protocol, (F) failed to move for the dismissal of the charge because the prosecutor intentionally delayed trial, (G) failed to move for the suppression of Petitioner's post-arrest statement that was obtained in violation of (i) his Fifth and Fourteenth Amendment right to counsel and (ii) self-incrimination, and (iii) was the fruit of a Fourth Amendment violation, (iv) [failed to] obtain evidence necessary for trial to be timely held, (v) [failed to] take actions to support the strategically chosen defense, and (H) failed to present evidence to show that Petitioner was only guilty of count five.

II.    Petitioner was denied his Sixth and Fourteenth Amendment right to self-representation and the right to represent himself under the Michigan Constitution.

III.    Judicial fact-finding based on less than proof beyond a reasonable doubt violated Petitioner's Sixth and Fourteenth Amendment rights.

IV.    Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel where counsel failed to raise the claims presented above, and request and properly conduct an evidentiary hearing on these issues, which entitle[d] Defendant to a new appeal of right.

V.    Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of appellate counsel where Issues I–III were not raise[d] on direct appeal, which overcomes any applicable procedural bar.

(Am. Pet., ECF No. 15, PageID.587–595.) Respondent has filed an answer to the petition (ECF No. 23) stating that the grounds should be denied because Petitioner may have failed to timely raise them, the Court's consideration of the grounds is barred by the doctrine of procedural default, and/or the grounds are without merit. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), Petitioner's habeas grounds lack merit; accordingly, the petition will be denied.

2

## Discussion

### I.      Factual allegations

Petitioner was charged with sexually penetrating his daughter—penetrating her mouth with his penis and her vagina with his mouth or tongue. The nature of the charged conduct is explained by the prosecutor during his opening statement. (Trial Tr. II, ECF No. 24-4, PageID.1947–1949.) The victim's testimony was brief. (*Id*., PageID.2003–2024.) The victim did not want to testify against her father—she testified that she still loved him a lot—she was compelled to appear by subpoena. (*Id*., PageID.2003.) Although it was not part of the conduct charged in this trial, the victim testified that Petitioner supplied her with marijuana and methamphetamine during the relevant time period and that she became an addict.

Petitioner was convicted of one instance of each type of penetration before the victim was 13 years old (Counts I and III, CSC-I because of the victim's age) and one instance of each type of penetration after the victim was 13 years old (Counts II and IV, CSC-I because of Petitioner's relationship with the victim). Petitioner was also convicted of sexually touching his daughter after she was 13 years old (Count V, CSC-II because of Petitioner's relationship with the victim).

The prosecutor presented testimony from seven witnesses: an expert in the area of child abuse; the victim; the victim's younger sister; the victim's drug rehab counselor; the detective who arrested Petitioner on drug charges; the victim's therapist; and the detective sergeant who investigated the charges, observed the interview of the victim, and interviewed Petitioner. The prosecutor put on his entire case in about four hours. The defense called five witnesses over the course of about an hour: three Family Independence Agency (FIA) workers who had contact with Petitioner's family; a family friend; and Petitioner's mother. Petitioner chose to not testify. The jurors deliberated for a few hours before returning their verdict.

3

Trial testimony disclosed that Petitioner sexually abused the victim for years. The prosecution's expert, Dr. Jim Henry, described the victim's living situation as a "very disruptive home history until May of 2002 and going from place to place in and out of foster care, in and out of placement with various homes, back to home, back with dad, back to mom, back to foster care and that sort of thing." (Trial Tr. II, ECF No. 24-4, PageID.1974.) Yet, despite several opportunities, including FIA investigations of sexual abuse accusations, the victim never disclosed the abuse.

After Petitioner was arrested on drug charges during the spring of 2002, the victim and two siblings—a younger sister and a younger brother—were placed in foster care. The victim ended up in a residential drug rehabilitation program. While the victim was in that program, during February of 2003, her younger sister disclosed that she suspected Petitioner had sexually abused the victim.

The victim was interviewed by police during February of 2003. She initially did not disclose. Then, after a time, she indicated a willingness to disclose, but not to police. The victim's drug rehab counselor, who had traveled to the police station with the victim, talked to the victim in the interview room. The police were not present, but they observed the disclosure and it was videotaped. Thereafter, during March of 2003, the victim was assessed by Dr. Jim Henry at the Children's Trauma Assessment Center in Kalamazoo, Michigan.

Not long after the victim's disclosure, Petitioner was transported to St. Joseph County for a hearing regarding his parental rights. While he was at the sheriff's office, he was arrested and interviewed by Detective Mohney regarding the victim's allegations. The nature of that interview is set out in more detail below, but during the interview, Detective Mohney showed Petitioner the videotape of the victim's disclosure. Afterwards Detective Mohney asked Petitioner if there was

4

anything on the tape of the victim's disclosure that was not true. According to Detective Mohney, Petitioner responded that "pretty much everything that [the victim] stated was true." (Trial Tr. II, ECF No. 24-4, PageID.2079.)

The trial occurred almost 19 years ago. Since that time, Petitioner's case has traveled up and down the Michigan court system several times. The tortuous procedural path is interesting, but it does not illuminate the habeas grounds that Petitioner has raised. To the extent the procedural elements are important, they are discussed below with respect to specific grounds.

As discussed above, the presentation of proofs took only a few hours. Petitioner's unending challenges to the result have consumed much more time. The brief in support of the amended petition is 130 pages long, accompanied by 200+ pages of exhibits. The state court record spans almost 4,000 pages, in large part because of Petitioner's voluminous filings. Winnowing out weaker arguments is the hallmark of effective advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986). There is certainly no constitutional right to have every possible colorable issue raised. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Petitioner has quite obviously disregarded those principles in presenting his habeas claims.

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *see Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

7

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.   Petitioner's Right to Self-representation (Habeas Ground II)

On the first day of trial, Petitioner's jury was selected and the trial court addressed pending motions. (Trial Tr. I, ECF No. 24-2.) On the second-day of trial, before opening arguments, Petitioner's trial counsel informed the trial court that Petitioner wanted counsel to file a motion seeking to quash the affidavit of probable cause. (Trial Tr. II, ECF No. 24-4, PageID.1932.) Counsel informed the court that she would not file the motion because she believed it to be frivolous. (*Id*.) She also informed the court that Petitioner wanted to remove counsel and replace her with "someone that will file that motion for him and represent his interests the way that he sees fit . . . ." (*Id*., PageID.1933.)

Petitioner argued that he had a right to represent himself. (*Id*., PageID.1934–1935.) The court informed Petitioner that the trial would proceed and that Petitioner would not be permitted to represent himself. (*Id*., PageID.1935–1936.) Instead, the court explained, after trial, if Petitioner did not prevail, he could, through appellate counsel, raise a claim that trial counsel was ineffective for failing to file the motion. (*Id*.) Petitioner seemed satisfied with that resolution. He stated: "I just wanted it on the record that I'm trying to file this motion." (*Id*., PageID.1936.)

Petitioner raised the "self-representation" issue for the first time in a motion for relief from judgment. Respondent argues that the claim is procedurally defaulted. (Resp. Answer, ECF No. 23, PageID.1744–1750.) Respondent claims that Petitioner failed to raise the claim on direct

8

appeal and then, in presenting his motion for relief from judgment, he did not establish cause for that failure and resulting prejudice or manifest injustice. In that circumstance, under Michigan Court Rule 6.508(D), the trial court could not grant relief.

When a state-law default—such as a failure to raise an issue on direct appeal in the absence of cause and resulting prejudice or manifest injustice—prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court enforced the rule so as to bar the claim, and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436–37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010). The Michigan Court of Appeals denied leave to appeal that determination initially, (Mich. Ct. App. Order, ECF No. 24-37, PageID.5037), and on reconsideration, (Mich. Ct. App. Order, ECF No. 24-37, PageID.5026), in form orders. The Michigan Supreme Court denied leave to appeal on October 8, 2021, also in a form order. (Mich. Order, ECF No. 24-34, PageID.4427.) The last reasoned state-court decision, therefore, is the trial court's bench opinion.

The trial court concluded that Petitioner did not make a request before the trial to represent himself and certainly no "unequivocal demand." (Dec. 19, 2017, Hr'g Tr., ECF No. 24-28, PageID.2677–2678.) Thus, it appears the trial court addressed Petitioner's claim on the merits. The trial court also determined that the issue could have been raised on direct appeal and was not. (*Id.*) But the trial court never squarely addressed whether Petitioner established cause for the failure to raise the issue on direct appeal and resulting prejudice or manifest injustice. Therefore, the Court concludes that the state court did not apply a state procedural rule to bar this claim and this Court's consideration of this claim is not barred by any procedural default.

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense. U.S. Const. amend. VI. At issue here is a corollary to that right, the right to self-representation. *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms."). The clearly established federal law regarding self-representation is expressed in two Supreme Court cases: *Faretta v. California*, 422 U.S. 806 (1975), and *Martinez v. Ct. of App. of Cal.*, 528 U.S. 152 (2000).

In *Faretta*, the Supreme Court found support for the right of self-representation in the structure of the Sixth Amendment right to the assistance of counsel:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.
>
> The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and

10

spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta*, 422 U.S. at 819–821 (footnotes and citations omitted).

Although the Supreme Court recognized a criminal defendant's right to self-representation, it acknowledged that the right was a qualified one. The constitutional mandate to provide counsel to a criminal defendant is premised upon the fact that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id*. at 834. Because a criminal defendant representing himself relinquishes that benefit, his waiver must be "knowingly and intelligently" made. *Id*. at 835. Moreover, the right to self-representation must yield to "the dignity of the courtroom." *Id*. at 834 n.46. It is not a license to ignore the rules of procedure or engage in "obstructionist misconduct." *Id*.

In *Martinez*, 528 U.S. at 152, the Supreme Court concluded that the right of self-representation did not extend to appeals. In reaching its conclusion, the Supreme Court commented on the scope of the right of self-representation established in *Faretta*, stating:

As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must "'voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be "made aware of the dangers and disadvantages of self-representation." A trial judge may also terminate self-representation or appoint "standby counsel"—even over the defendant's objection—if necessary. We have further held that standby counsel

11

may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the "appearance before the jury" that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Martinez*, 528 U.S. at 161–162 (citations and footnote omitted).

In Petitioner's case, the trial court was unwilling to delay trial further, (Trial Tr. II, ECF No. 24-4, PageID.1935–1936), a result that appeared inevitable if Petitioner were to dispense with the assistance of counsel. Put differently, the morning of the second day of trial was simply too late to accommodate Petitioner's request to represent himself. Accordingly, the trial court refused to consider Petitioner's request. The trial court's consideration of the timeliness of Petitioner's requests and concern regarding the delay that would follow from granting them is in no way contrary to clearly established federal law. In *Hill v. Curtin*, 792 F.3d 670 (2015) (*en banc*), the Sixth Circuit explained:

*Faretta* did not establish a bright-line rule for timeliness. Its holding does, however, necessarily incorporate a loose timing element. The *Faretta* Court explicitly stated that the defendant's request was "[w]ell before the date of trial," and "weeks before trial." It then held, "[i]n forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense." Thus, to the extent that *Faretta* addresses timeliness, as a matter of clearly established law it can only be read to require a court to grant a self-representation request when the request occurs weeks before trial.

Beyond this loose limit, the *Faretta* Court did not address timeliness . . . . Although lower courts have since established rules regarding when a defendant must assert his right, . . . the Supreme Court has never defined the precise contours of *Faretta*'s timing element. Nor did the Supreme Court announce any clearly established law on timeliness in *Martinez*. . . . Given the general standard articulated in *Faretta*, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

*Hill*, 792 F.3d at 678–79 (emphasis in original) (citations omitted).

12

The *Hill* court reasoned further that "[a] trial judge may fairly infer on the day of trial—as the jurors are on their way to the courtroom—that a defendant's last-minute decision to represent himself would cause delay, whether or not the defendant requests a continuance." *Hill*, 792 F.3d at 162; *see also Jones v. Bell*, 801 F.3d 556, 564-65 (6th Cir. 2015) ("'[A]s a matter of clearly established law[, *Faretta*] can only be read to require a court to grant a self-representation request when the request occurs *weeks before trial*'—not on the morning of trial. The trial court's decision here was therefore not 'contrary to' *Faretta*'s holding, because Jones's request was made on the *first day* of trial, as opposed to weeks before trial." (emphasis in original) citations omitted)); *Walter v. Kelly*, 653 F. App'x 378, 386 (6th Cir. 2016) ("Courts have consistently held that requests made during or on the eve of trial are not timely."); *Floyd v. Haas*, No. 17-1295, 2017 WL 4182096, at *2 (6th Cir. Sept. 13, 2017) ("'[A] trial judge may fairly infer on the day of trial . . . that a defendant's last-minute decision to represent himself would cause delay,' and that such an inference is a reasonable basis on which to deny the request." (citation omitted)); *Hopson v. Gray*, No. 19-3709, 2019 WL 7757815, at *2 (6th Cir. Dec. 27, 2019) ("Hopson did not . . . indicate any desire to proceed pro se until [the trial] began . . . . 'A trial judge may fairly infer on the day of trial . . . that a defendant's last-minute decision to represent himself would cause delay.'" (citation omitted)).

In light of the latitude afforded to state courts in determining the timeliness of a self-representation request, denial of such a request on the morning of the second day of trial is certainly not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on his claim that the trial court should have permitted Petitioner to represent himself.

## IV.     "Judge-found" Facts (Habeas Ground III)

Petitioner next complains that his sentence violates his Sixth Amendment right to trial by jury because it is based on facts found by the judge and not decided by the jury or admitted by Petitioner. Petitioner bases his Sixth Amendment claim on a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Ring v. Arizona*, 53 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne v. United States*, 570 U.S. 99 (2013). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence.  In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding. The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, reiterating the rule that any fact that increases the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt." *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Thereafter, in *Alleyne*, 570 U.S. 99, the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences. The *Alleyne* court was not writing on a blank slate. More than 10 years earlier, the Supreme Court held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment. *Harris v. United States*, 536 U.S. 545 (2002). Relying on *Harris*, as well as *Apprendi*, *Booker*, and *Blakely*, the Michigan Supreme Court concluded that any guidelines sentence, even one based on facts and circumstances not proven to a jury beyond a reasonable doubt, was permissible under the

14

Sixth Amendment, so long as it did not exceed the statutory maximum. *People v. Drohan*, 715 N.W.2d 778, 784–87 (2006).

That was the state of the law when Petitioner's judgment became final by the completion of direct review. Critically, in *In re Mazzio*, 756 F.3d 487 (6th Cir. 2014), the Sixth Circuit held that "*Alleyne* does not apply retroactively to cases on collateral review." *Mazzio*, 756 F.3d at 491. Therefore, *Alleyne*—the case upon which Petitioner's entire argument depends—does not apply.

Moreover, with respect to all of Petitioner's sentences, even if *Alleyne* applied, the proscription against using judge-found facts to dictate a mandatory minimum guidelines range is immaterial because the trial court did not sentence Petitioner based on a mandatory minimum guidelines range—the court departed upward from that range. From the inception of this line of authority in *Apprendi* to its most recent refinement in *Alleyne*, the United States Supreme Court has never suggested that judicial fact-finding in support of the court's exercise of discretion, as happened here when the court departed upward from the minimum range established by the guidelines, violates the Sixth Amendment. *See Booker*, 543 U.S. at 232 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *see also Apprendi*, 530 U.S. at 481–82 (reiterating that "'a sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review'") (emphasis added) (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)); *see also Reign v. Gidley*, 929 F.3d 777, 781 (6th Cir. 2019) ("But the constitutional error here was the mandatory application of the guidelines, not merely the

15

consideration of judge-found facts."). Petitioner's *Alleyne* claim is meritless whether the guidelines were mandatory or discretionary because the trial court sentenced Petitioner outside the guidelines.

Petitioner has failed to demonstrate that the state courts' rejection of his Sixth Amendment sentencing claim is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## V.     Speedy Trial (Habeas Ground I (F))

In Petitioner's direct appeal, he complained that he suffered a violation of the constitutional guarantee of a "speedy trial." In his amended petition, that same complaint is expressed as part of his claim that trial counsel rendered ineffective assistance: "Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel where defense counsel . . . (F) failed to move for the dismissal of the charge because the prosecutor intentionally delayed trial . . . ." (Am. Pet., ECF No. 15, PageID.588.)

Respondent acknowledges that the speedy trial claim was raised on direct appeal. The ineffective assistance claim for failing to seek dismissal on speedy trial grounds, however, was not. Respondent contends that this claim is now procedurally defaulted. The procedural default in this instance is different than the default discussed above in Part III. The problem is not that Petitioner failed to raise an issue on direct appeal and then the trial court declined to consider it on a motion for relief from judgment because the failure was unexcused. In this instance, the problem is that Petitioner entirely failed to fairly present the issue to the Michigan Court of Appeals.

The Michigan Court of Appeals never addressed Petitioner's speedy trial ineffective assistance claim. It was not included in the application for leave filed by counsel and counsel

misfiled the *pro per* supplemental brief that included the issue.[1] As a result, the court of appeals never considered the claim. Petitioner raised it in the Michigan Supreme Court. That court denied leave by order entered October 8, 2021. (Mich. Order, ECF No. 24-34, PageID.4427.) Thus, Petitioner's speedy trial ineffective assistance claim was before the supreme court when that court denied leave to appeal.

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *O'Sullivan*, 526 U.S. at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.

---

[1] The trial court announced the denial of Petitioner's motion for relief from judgment in a bench opinion issued December 17, 2019. (ECF No. 24-18.) No order was entered. Petitioner eventually filed an application for leave to appeal the bench opinion. (Pet'r's Appl. for Leave to Appeal, ECF No. 24-28, PageID.3247.) The court of appeals dismissed the application for lack of jurisdiction because the trial court had not entered an order denying the motion. (Mich. Ct. App. Order, ECF No. 24-28, PageID.3242.) Shortly thereafter, the trial court entered an order denying the motion, (ECF No. 24-19), and Petitioner filed a new application seeking leave to appeal that order, (ECF No. 24-38, PageID.5346–5374). At the same time counsel filed the new application, she also filed the *pro per* supplemental materials that had been filed with the immediately preceding application. Unfortunately, counsel failed to change the case number on those materials. As a result, they were filed in the preceding appeal. Case Information, *People v. Barnes*, No. 354679 (Mich. Ct. App.), https://www.courts.michigan.gov/c/courts/coa/case/354679 (last visited Mar. 26, 2023). Before the error was discovered, the court of appeals had denied leave to appeal. (ECF No. 24-38, PageID.5345.) After the error was discovered, the court of appeals denied Petitioner's motion for reconsideration and leave to file the *pro per* supplemental materials. (ECF No. 24-37, PageID.5026.).

17

*O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

Fair presentation has a substantive component and a procedural component. With regard to substance, fair presentation is achieved by presenting the asserted claims in a constitutional context through citation to the Constitution, federal decisions using constitutional analysis, or state decisions which employ constitutional analysis in a similar fact pattern. *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993); *see also Picard*, 404 U.S. at 277–78. With regard to procedure, the fair presentation requirement is not satisfied when a claim is presented in a state court in a procedurally inappropriate manner that renders consideration of its merits unlikely. *Olson v. Little*, 604 F. App'x 387, 402 (6th Cir. 2015) ("[W]here [a] claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, [it does not] constitute 'fair presentation.'" (alterations in original) (internal quotation marks omitted) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989))); *see also Ogle v. Ohio Dep't of Rehab. & Corr.*, No. 17-3701, 2018 WL 3244017, at *2 (6th Cir. Feb. 27, 2018); *Stokes v. Scutt*, 527 F. App'x 358, 363–64 (6th Cir. 2013).

Petitioner did not fairly present the *pro per* motion for relief from judgment issues in the court of appeals. They were presented in connection with a motion for reconsideration asking leave to file a brief after the application for leave to appeal had already been decided. That is a circumstance where the appellate court would not consider the issues absent special and important reasons. It is not a procedurally fair presentation. The issue remains unexhausted.

Critically, Petitioner cannot return to the state courts and fix the error. Under Michigan Court Rule 6.502(G), Petitioner is permitted to file one, and only one, motion for relief from judgment. *See, e.g.*, *Daniels v. Kawalski*, No. 19-1891, 2020 WL 628476, at *4 (6th Cir. Jan. 7,

2020) ( "[Petitioner] also could not return to the state courts and raise these claims in a second or successive motion for relief from judgment because Michigan Court Rules allow for 'one and only one motion for relief from judgment . . . with regard to a conviction.' Mich. Ct. R. 6.502(G)(1)."). There are exceptions for motions based on new evidence or a retroactive change in law, Mich. Ct. R. 6.502(G)(2), but the exceptions do not apply to Petitioner's speedy trial ineffective assistance claim.

The absence of an available state remedy forgives Petitioner's failure to exhaust, but it also creates a procedural default. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) ("This rule [that the federal court may address the petition if the state court did not clearly and expressly rely on an independent and adequate state ground] does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims."); *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman* and stating that "[i]f the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred"), *rev'd on other grounds*, 535 U.S. 635 (2002).

The United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citations omitted); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved

19

complicated issues of state law."); *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The procedural default bar is not absolute. To overcome it, a petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman*, 501 U.S. at 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495 (1986). The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner acknowledges that he committed the CSC-II offense of which he was convicted, and he has certainly not provided any "new reliable evidence" to support a claim of actual innocence. So "actual innocence" is not an option to overcome any procedural default bar. Instead, Petitioner contends that there was cause for his failure to properly raise issues in the Michigan Court of Appeals and resulting prejudice.

Petitioner offers as cause for the failure to raise the issue on appeal the ineffective assistance of his counsel in misfiling the *pro per* brief. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective

assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) **_that counsel's deficient performance prejudiced the defendant_** resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. Ineffective assistance claims require analysis of prejudice, which necessarily involves inquiry into the merits of Petitioner's speedy trial ineffective assistance of trial counsel claim.[2]

Because simply addressing the issue of "cause" as part of the procedural default analysis requires delving into the merits, the Court concludes that resolving the procedural default issue raises more questions than the case on the merits. In that circumstance, the Court may—and will—assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215–16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner was arrested for these charges on May 22, 2003. (St. Joseph Cnty. Cir. Ct. Register of Actions, ECF No. 24-1, PageID.1780.) His trial began on April 27, 2004, approximately 11 months after his arrest.[3]

---

[2] Moreover, because the Court must evaluate whether appellate counsel rendered ineffective assistance in failing to timely file a *pro per* brief that raised a claim of trial counsel's ineffective assistance, there are two layers of the prejudice analysis.

[3] Although Petitioner was held in custody from the date of his arrest, he was not held in custody pursuant to the CSC charges. *See* Register of Actions, *People v. Barnes*, No. 02-11164-FH (St. Joseph Cnty. Cir. Ct.), https://courts.stjosephcountymi.org/c45Cases/ (search Last Name "Barnes," First Name "Jeffery," select Case # "0211164FH1") (last visited Mar. 27, 2023). Petitioner entered a guilty plea to a drug charge on December 13, 2002. On January 10, 2003, Petitioner was sentenced to 2 years, 7 months to 30 years' imprisonment on that conviction. Thus, the entire time Petitioner awaited trial on the CSC charges, he was already in custody for a felony conviction.

In *Brown v. Romanowski*, 845 F.3d 703 (6th Cir. 2017), the Sixth Circuit Court of Appeals reviewed the clearly established federal law with respect to the constitutional requirement for a speedy trial:

> The Sixth Amendment guarantees in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. These rights apply to the states through the Fourteenth Amendment. *Klopfler v. North Carolina*, 386 U.S. 213, 223 (1967). The purpose of the speedy-trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished. *Doggett v. United States*, 505 U.S. 647, 654 (1992); *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986); *United States v. MacDonald*, 456 U.S. 1, 7–8 (1982); *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972); *United States v. Marion*, 404 U.S. 307, 320 (1971); *United States v. Ewell*, 383 U.S. 116, 120 (1966). The sole remedy for a violation of the speedy-trial right is dismissal of the charges. *See Strunk v. United States*, 412 U.S. 434, 439–40 (1973); *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999).
>
> In *Barker*, the Supreme Court established a four-factor test for determining whether a defendant has been denied the constitutionally guaranteed right to a speedy trial. *Barker* held that a court must consider (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. No one factor is dispositive. Rather, they are related factors that must be considered together with any other relevant circumstances. *Id.* at 533.

*Brown*, 845 F.3d at 712. The *Barker* Court acknowledged that its test was a flexible balancing test and, thus, "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Barker*, 407 U.S. at 529–530. The flexibility of the test has significant implications for this Court's review under the AEDPA standard. "'The more general the rule at issue'—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough*, 541 U.S. at 664).

In the Michigan state courts, the right to a speedy trial is guaranteed by the United States constitution, U.S. Const. amend VI; the Michigan constitution, Mich. Const. 1963 art.1, § 20; state

22

statute, Mich. Comp. Laws § 768.1; and court rule, Mich. Ct. R. 6.004(D). *People v. Cain*, 605 N.W.2d 28, 39 (Mich. Ct. App. 1999); *People v. McLaughlin*, 672 N.W.2d 860, 867 (Mich. Ct. App. 2003). The Michigan state courts apply the *Barker* four-factor test "to determine if a pretrial delay violated a defendant's right to a speedy trial[,]" whether the speedy trial right at issue arises from federal or state law. *Cain*, 605 N.W.2d at 39 (citing *People v. Collins*, 202 N.W.2d 769 (Mich. 1972)).[4]

To the extent that the state constitutional, statutory, and rule guarantees relating to a speedy trial require anything more than clearly established federal law requires, those additional requirements are purely matters of state law. Petitioner's challenges to the court of appeals' determinations with regard to state law are not cognizable on habeas review. As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68. The decision of the state courts on a state law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (stating "[w]e have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

---

[4] Although the state courts apply the clearly established federal law, the *Barker* test, to evaluate "speedy trial" claims, they apply it a little differently than the federal courts. The state courts shift the burden of proof with respect to prejudice based on the length of the delay, drawing the line at 18 months. *Cain*, 238 Mich. App. at 112. The federal courts, however, eschew such a "bright-line rule." *Brown*, 845 F.3d at 717. Instead, the federal "courts must conduct a functional analysis of the right in the particular context of the case." *Id.* (internal quotation marks omitted) (quoting *United States v. Ferreira*, 665 F.3d 701, 709 (6th Cir. 2011)); *see Barker*, 407 U.S. at 522. This is a difference between the federal and state applications of the test, but the difference does not render the state court's application unreasonable or contrary to *Barker*. *See, e.g.*, *Brown v. Bobby*, 656 F.3d 325, 329–330 (6th Cir. 2011) (concluding that Ohio's use of a 270-day rule was not "contrary to" *Barker*).

Because the Michigan Court of Appeals' applied the *Barker* four-factor test, there is no question that they applied a standard that is consistent with clearly established federal law. To prevail, Petitioner must show that the court applied that standard unreasonably or in a way that is contrary to *Barker*. The court of appeals analyzed Petitioner's claim as follows:

> The federal and state constitutions guarantee a criminal defendant a speedy trial without reference to a fixed number of days. U.S. Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; *People v. McLaughlin*, 258 Mich App 635, 644; 672 NW2d 860 (2003). In determining whether a defendant was denied his right to a speedy trial, a court must balance four factors: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant from the delay. *People v. Mackle*, 241 Mich App 583, 602; 617 NW2d 339 (2000). The fourth element, prejudice, is critical to the analysis. *Cain*, *supra* at 112. If the delay is 18 months or more, prejudice is presumed and the prosecutor has the burden to rebut the presumption. *Id*. If the delay is less than 18 months, a defendant is required to prove that he suffered prejudice. *Id*. Because the delay in bringing defendant to trial was less than 18 months, defendant must prove that [he] was prejudiced by the delay.
>
> Defendant asserts that he was prejudiced in two ways: (1) he had untried charges hanging over his head; and (2) the delay harmed his defense. Defendant's assertions are without merit. Anxiety alone is insufficient to establish a violation of the right to a speedy trial. *People v. Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997). Further, rather than harming the defense, the delay benefited the defense. The delay produced two witnesses who testified that the victim had previously denied that defendant sexually abused her. Because defendant has failed to demonstrate that he was prejudiced by the delay, he has failed to establish that his right to speedy trial was violated. *McLaughlin*, *supra* at 635.

*People v. Barnes*, No. 266170, 2007 WL 1754585, at *2 (Mich. Ct. App. Jun. 19, 2007).[5]

The Michigan Court of Appeals' balancing of the four factors does not appear to be unreasonable.[6] The length of delay in this instance was not remarkable. Delays of less than a year

---

[5] The Court cites the court of appeals decision as it appears on Westlaw because the relevant page is missing from the opinion in the Rule 5 materials. (Mich. Ct. App. Op., ECF No. 24-20, PageID.2693–2694.)

[6] As part of its state speedy trial analysis, the court of appeals made several findings with regard to the nature of the delay:

might be so ordinary that they do not even trigger analysis of the other factors. *Doggett v. United States*, 505 U.S. 647, 651–652 (1992). Moreover, as the appellate court noted, the critical element is prejudice.[7] Certainly, the court of appeals' conclusion that prejudice cannot be presumed from an 11-month delay is not unreasonable.

Petitioner does not focus principally on the prejudice he suffered because of the delay. He concentrates instead on blaming the prosecutor and speculating that the prosecutor caused the delay to gain an advantage. (Pet'r's Br., ECF No. 16, PageID.670–675.) Petitioner's argument is disingenuous. It is undisputed that the trial did not occur during November of 2003, when it was originally scheduled, because Petitioner's counsel wanted more time to obtain records from the FIA. Petitioner waived his speedy trial rights to permit that investigation to proceed. Petitioner

---

The prosecution made a good faith effort to bring defendant to trial within the 180-day period. Defendant's trial was set to commence on November 11, 2003, and the prosecution was ready to try defendant. Nonetheless, defendant requested that he be tried in December 2003, so that defense counsel could obtain records from the Family Independence Agency (FIA), which counsel believed were necessary to finalize defendant's witness list. A trial date was set for December 10, 2003. Defendant's trial did not commence, however, until April 27, 2004. The trial court, in denying defendant's motion to dismiss, held that defendant was at fault for the several-month delay in the commencement of his trial. Such a finding was not clearly erroneous. *People v. Crawford*, 232 Mich. App 608, 612; 591 NW2d 669 (1998). By April 8, 2004, defendant had still not received the FIA records, and he therefore moved the trial court for an order requiring the FIA to provide him with the records. Before this, the prosecution had attempted to help defendant obtain the FIA records. Approximately two weeks later, on April 21, 2004, defendant finally filed his witness list. Because the delay in bringing defendant to trial was not an inexcusable delay attributable to the prosecution that evidenced an intent not to promptly bring defendant to trial, there was no violation of the 180-day rule.

*Barnes*, 2007 WL 1754585, at *1.

[7] The *Barker* Court identified three specific categories of harm that might accrue to a pretrial detainee because of undue delay in proceeding with trial: "(i) . . . oppressive pretrial incarceration; (ii) . . . anxiety and concern of the accused; and (iii) . . . the defense [could] be impaired." *Barker*, 407 U.S. at 532 (footnote omitted). The first category is not relevant in Petitioner's case because he was in custody for another conviction.

claims that he only waived those rights for a month. There is nothing in the record that supports any such express limit. In fact, there is nothing in the record at all to explain why trial dates in December of 2003 and January of 2004 were adjourned.[8]

Even though there is no record of the reasons for additional adjournments, it is undisputed that the prosecutor attempted to assist the defense in obtaining documents from the FIA. The agency, however, ultimately refused to turn over the documents without a court order. The court signed such an order at the request of Petitioner's counsel and, shortly thereafter, Petitioner's trial commenced.

The court of appeals went much further than simply rejecting a presumption of prejudice. The court affirmatively determined that the delay actually benefited Petitioner because it resulted in the identification of two witnesses who testified that the victim had previously denied that Petitioner had sexually abused her.

Petitioner does not contradict that determination; instead, he posits that the delay resulted in prejudice anyway:

> On cross-examination defense counsel attempted to question [the victim] about several previous incidents where she was interviewed by police and counselors where she had repeatedly denied any abuse. However, she could not remember the specific instances where she failed to disclose. (T2, 88–91). Petitioner was

---

[8] Petitioner has filed a motion to produce additional transcripts (ECF No. 26), specifically transcripts of the status conferences that occurred between November of 2003 and the trial during April of 2004. Petitioner suggests that the transcripts were not provided because the court reporter was no longer available. (Pet'r's Mot., ECF No. 26, PageID.5674.) Petitioner raised this issue with the trial court. Although the court initially suggested a potential problem in obtaining transcripts from the court reporter, who had left the court, the court clerk clarified that anything "on the record" would have been transcribed for Petitioner's appeals. (Jul. 21, 2014, Hr'g Tr., ECF No. 24-10, PageID.2276.) The fact that there were no transcripts, the clerk opined, meant that the proceedings were not on the record. To press the trial court now to produce records it could not produce ten years ago is unnecessary. As set forth fully below, Petitioner's inability to establish any prejudice from delay in scheduling his trial effectively renders the attribution of fault for the delay superfluous. For that reason, Petitioner's motion (ECF No. 26) will be denied.

> prejudiced by the lengthy delay as he could not confront [the victim] with each
> statement that was inconsistent with her testimony.

(Pet'r's Br., ECF No. 16, PageID.675.) Petitioner's logic is flawed on a couple of levels. First, Petitioner suggests that the passage of time from November of 2003 through April of 2004 weakened the victim's memory of specific instances where she denied sexual abuse. But the victim's denials spanned a period of years, from prepubescence to her teens. Given the span of time at issue, to argue that the victim could not remember in April, but would have remembered in November is nonsensical.

Second, the fact that the victim did not specifically recall each instance where she denied sexual abuse was not material. The point was not that the victim denied sexual abuse on this date or that date—or when she spoke to this person or that person; the point was that the victim denied sexual abuse *every time she was asked* until she eventually disclosed the abuse to her drug rehab counselor. Petitioner's counsel emphasized that point on cross-examination of the victim and then drove it home by calling the FIA workers who were charged with investigating reports of sexual abuse and who testified that the victim specifically denied such abuse. Petitioner could not have presented those witnesses if the trial had occurred during November of 2003.

In other words, the court of appeals' factual determinations regarding the reasons for the delay and the consequence of that delay for Petitioner find ample support in the record. Certainly Petitioner has failed to demonstrate that those factual determinations are unreasonable. In light of the appellate court's further determination that Petitioner suffered no prejudice as a result of the delay, the court's determination that Petitioner's speedy trial rights were not violated is neither contrary to, nor an unreasonable application of, clearly established federal law.

But Petitioner does not raise this claim directly as a speedy trial violation. Instead, he contends that his counsel rendered ineffective assistance for failing to object to the delays. As

noted above, in *Strickland*, 466 U.S. 668, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (citing *Harrington*, 562 U.S. at 102) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ").

In this instance, however, the objection urged by Petitioner would have lacked merit. For the reasons set forth above, there was no federal constitutional speedy trial violation and there was no state constitutional, statutory, or rule speedy trial violation. "[O]mitting meritless arguments is

neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Under *Strickland*, Petitioner must show that counsel's failure to object was professionally unreasonable and prejudicial. Because he cannot satisfy either requirement, his ineffective assistance of counsel claim necessarily fails.

## VI. Failure to Suppress Petitioner's Post-arrest Statement (Habeas Ground I (A) and (G)(i) and (ii))

Petitioner was arrested for the CSC charges during May of 2003, when he was returned to St. Joseph County from MDOC custody for the purpose of a parental rights hearing. At that time, Petitioner was interviewed by Detective Mohney. Detective Mohney testified at trial regarding Petitioner's statements during that interview. The interview was videotaped; but by stipulation of the parties, the video of the interview was not played for the jury because the video made many references to Petitioner's prior drug crimes and prior conviction of CSC-IV. (Trial Tr. I, ECF No. 24-2, PageID.1900–1903.) Instead, Detective Mohney provided a synopsis of the Petitioner's statements during the interview. The parties had an agreement that Petitioner could provide excerpts from the video record of the interview if Petitioner believed Mohney's synopsis was not accurate.

Petitioner raised this ineffective assistance claim for the first time in his *pro per* supplemental brief on his initial appeal as of right. (Pet'r's Supp. Appeal Br., ECF No. 24-20, PageID.2753–2756.) At that time, he relied on Detective Mohney's testimony regarding the interview, rather than the video record of the interview, to support his challenge.

The Michigan Court of Appeals, also relying on Detective Mohney's testimony, rejected Petitioner's challenge:

> A prosecutor may not use a custodial statement as evidence against a defendant unless the defendant, prior to being questioned, was warned of his *Miranda*[2] rights.

*People v. Harris*, 261 Mich App 44, 55; 680 NW2d 17 (2004). If the defendant indicates at any time that he wishes to invoke his right to remain silent, the police must cease their interrogation. *Michigan v. Mosley*, 423 US 96, 100–101; 96 S Ct 321; 46 L Ed 2d 313 (1975). The police may, however, resume questioning of the defendant if they first "scrupulously honored" the defendant's right to cut off questioning. *Id.* Police fail to "scrupulously honor" a defendant's right to cut off questioning when they refuse to discontinue the interrogation or persist in repeated efforts to wear down the defendant's resistance. *People v. Slocum (On Remand)*, 219 Mich App 695, 699–700; 558 NW2d 4 (1996). A defendant must unequivocally assert his right to remain silent. *People v. Adams*, 245 Mich App 226, 233–234; 627 NW2d 623 (2001).

We agree with defendant that he unequivocally asserted his right to remain silent. However, according to the record, this was not a case where, after defendant asserted his right to remain silent, the interrogating officer failed to scrupulously honor defendant's right to cut off questioning. After defendant asserted his right to remain silent, he initiated further conversation. Defendant informed the officer that he did not believe the victim's allegations. Because this was not a case where the interrogating officer failed to scrupulously honor defendant's right to cut off questioning, defendant's post-arrest statement was not obtained in violation of his *Miranda* rights. Accordingly, a motion to suppress defendant's post-arrest statement on the basis that it was obtained in violation of his *Miranda* rights would have been futile. Counsel is not ineffective for failing to make a futile objection. *People v. Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

_____

[2] *Miranda v. Arizona*, 384 U.S. 436; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966).

*Barnes*, 2007 WL 1754585, at *4–5.

The court of appeals plainly relied on clearly established federal law, *Miranda* and *Mosley*, in resolving Petitioner's challenge. *Miranda* introduced the concept that a person's exercise of the rights must be "scrupulously honored." *Miranda*, 384 U.S. at 479. And *Mosley* made clear that the exercise of the right to cut off questioning did not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject . . . ." *Mosley*, 423 U.S. at 102–03. The court of appeals looked at Detective Mohney's testimony, concluded the detective had scrupulously honored Petitioner's exercise of the right to cut off questioning, and only renewed

the conversation when Petitioner re-initiated it. There is nothing in those determinations that is contrary to *Miranda*, *Mosley*, or any other clearly established federal law.

The court of appeals' factual determinations were well-supported by Detective Mohney's testimony. The detective testified that he read Petitioner his rights. (Trial Tr. II, ECF No. 24-4, PageID.2076–2077.) When Detective Mohney asked whether Petitioner wished to talk to the detective at that time, Petitioner stated "no." (*Id.*, PageID.2077.) Thereafter, according to Detective Mohney, he did not ask any questions of Petitioner; instead, Petitioner made an unsolicited statement that started a conversation that led to his admissions. (*Id.*) The Court concludes therefore that, if Petitioner is attempting to demonstrate that the court of appeals' factual determinations are unreasonable on this record, he has failed.

Petitioner takes a different approach in attacking the court of appeals' resolution of the issue. Relying on federal circuit court cases, Petitioner argues that Mohney's testimony does not suffice to show that the interrogation was ended before he re-initiated the conversation. (Pet'r's Brief in Support of Am. Pet., ECF No. 16, PageID.608 (citing *Christopher v. Florida*, 824 F.2d 836, 845 (11th Cir. 1987)).) That is so because, under another federal circuit court decision, Petitioner claims that Mohney used other words or actions to elicit Petitioner's re-initiation of the conversation. (*Id.*, at PageID.609–609 (citing *McKinney v. Ludwick*, 649 F.3d 484, 489 (6th Cir. 2011)).)

Each of those decisions touch upon important considerations in determining whether the police "scrupulously honored" the interviewee's exercise of the right to remain silent. But neither is conclusively dispositive. In *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), the Sixth Circuit Court of Appeals explained that the *Mosley* standard is more open-ended than that:

> [T]he [*Mosley*] Court adopted the following standard: "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends

under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id*. at 104, 96 S. Ct. 321.

The Supreme Court did not adopt a bright-line rule for determining whether law enforcement officials have satisfied this standard. But the Court did provide guidance on the issue by explaining that the police "fail[ ] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id*. at 105–06, 96 S. Ct. 321 (brackets added). Factors favoring a finding that the police have scrupulously honored a defendant's rights include where "[1] the police . . . immediately ceased the interrogation, resumed questioning only after [2] the passage of a significant period of time and the provision of a fresh set of warnings, and [3] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id*. at 106, 96 S. Ct. 321 (brackets added). Mosley "neither elevates any one factor as predominant or dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession 'was obtained in a manner compatible with the requirements of the Constitution.'" *United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir.1998) (quoting *Miller v. Fenton*, 474 U.S. 104, 112, 106 S Ct. 445, 88 L.Ed.2d 405 (1985)).

In holding that Fleming's confession was admissible under *Mosley*, the Michigan Court of Appeals emphasized that there was no evidence indicating that the police endeavored to "wear down [Fleming's] resistance and make him change his mind." *See Mosley* 423 U.S. at 105, 96 S. Ct. 321. Although Fleming confessed before receiving a fresh set of *Miranda* warnings, the Michigan court's conclusion was premised upon its finding that the police did not actually interrogate Fleming a second time before he voluntarily chose to confess.

*Id*. at 528–29. Petitioner's suggestion that every *Mosley* consideration must favor the police before a confession would be admissible is simply wrong.

As the Supreme Court has observed, the more general the rule at issue and, thus, the greater potential for reasoned disagreement among fair-minded judges, the more leeway state courts have in reaching outcomes in case-by-case determinations. *Renico*, 559 U.S. at 776. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White*, 572 U.S. at 424 (2014) (internal quotation marks omitted). The Court concludes that under *Fleming*'s characterization of the *Mosley* standard, the court of appeals enjoyed broad discretion here. Petitioner has failed to demonstrate that the state

32

court's exercise of that discretion is contrary to, or an unreasonable application of, clearly established federal law.

Once again, however, the matter before the Court is not simply whether the confession was properly admitted, the issue is whether Petitioner's counsel rendered ineffective assistance for not attempting to keep it out. The Michigan Court of Appeals concluded a motion to suppress the confession would have been futile.

In resolving Petitioner's myriad ineffective assistance of counsel claims, the Michigan Court of Appeals applied the following standard:

> "To establish ineffective assistance of counsel, a defendant must prove that his counsel's performance was deficient and that, under an objective standard of reasonableness, [he] was denied his Sixth Amendment right to counsel." *People v. Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005). A defendant must also prove that his counsel's deficient performance was prejudicial to the extent that, but for counsel's error, the result of the proceedings would have been different. *Id*. A defendant must overcome a strong presumption that his counsel's assistance constituted sound trial strategy. *People v. Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000).

*Barnes*, 2007 WL 1754585, at *4. Although the court of appeals cited state court authority for the standard, the standard applied is identical to *Strickland*. That is not surprising. The *Sabin* court identified the source of the standard as *Strickland*, *see Sabin*, 620 N.W.2d at 22, and the *Mack* court's statement of the standard tracks back to *People v. Pickens*, 521 N.W.2d 797 (Mich. 1994). In *Pickens*, the Michigan Supreme Court considered whether Michigan's constitutional guarantee of the right to effective assistance of counsel was broader in any respect than the right afforded by the federal constitution. The supreme court concluded that the rights were coextensive and, accordingly, that the proper standard to evaluate ineffective assistance of counsel claims, whether the claims were based on the state or the federal constitution, was the *Strickland* standard. *Pickens*, 521 N.W.2d at 308–327. Thus, the issue is not whether the court of appeals applied the right standard; it is whether the court of appeals applied the standard reasonably.

For the reasons stated above, a motion to suppress the statement would have lacked merit. And, because "omitting meritless arguments is neither professionally unreasonable nor prejudicial," *Coley*, 706 F.3d at 752, Petitioner has failed to demonstrate that the court of appeals' rejection of this ineffective assistance claims was contrary to, or an unreasonable application of, *Strickland*.[9]

## VII.    Failure to Object to Hearsay Statements (Habeas Ground I (B))

Petitioner next complains that trial counsel rendered ineffective assistance because she failed to object to hearsay statements, specifically testimony by expert witness Jim Henry and counselors Tara Herman and Brooke Sherman Bailey regarding statements made to them by the victim regarding the sexual abuse and drug use. Although the court of appeals agreed with Petitioner that the statements were not "nonhearsay" under Michigan Rule of Evidence 801(d)(1)(B), the court simply skipped over the analysis of whether the statements might have been admissible under another hearsay exception, choosing to focus instead on a complete lack of prejudice to Petitioner. *Barnes*, 2007 WL 1754585, at *8. The court of appeals reviewed the testimony and concluded that the hearsay statements were simply cumulative of the testimony that the victim offered. Therefore, the court of appeals reasoned, there was nothing to suggest that the result of the trial would have been different if counsel had objected.

---

[9] As a final note, ten years after the Michigan Court of Appeals rejected Petitioner's *Miranda/Mosley* challenge, Petitioner commissioned a transcript of the video interview. He attaches it to his brief in support of the amended petition. (Exhibit B, ECF No. 16-2, PageID.742–786.) The transcript generally tracks the testimony that Detective Mohney offered. The most significant difference, however, is that Petitioner's purported exercise of his right to remain silent and his re-initiation of the conversation occurred in virtually the same breath. It is not so much that Petitioner unequivocally terminated the interview and then later waived his right. Based upon the transcript, a court might well be justified in concluding that, rather than exercising his right to silence and then re-initiating the conversation on his own volition, Petitioner never unequivocally exercised his right to remain silent in the first place.

The court of appeals' determinations are faithful to the clearly established federal law of *Strickland*. Absent prejudice, an ineffective assistance of counsel claim necessarily fails. But, that still leaves the question, was the court of appeals' determination that the hearsay testimony was not prejudicial because it was cumulative of other evidence contrary to, or an unreasonable application of clearly established federal law?

In *Wong v. Belmontes*, 558 U.S. 15 (2009), the Supreme Court concluded that adding cumulative evidence to what was already there "would have made little difference" such that Belmontes could not "establish *Strickland* prejudice." *Wong*, 558 U.S. at 22. More recently, the Sixth Circuit assessed whether the introduction of cumulative evidence could be considered prejudicial in *England v. Hart*, 970 F. 3d 698 (6th Cir. 2020), stating:

> Next, England argues that the affidavit was corroborative, rather than cumulative, of the aspects of the Woodfork statements that the prosecution relied on. "[E]vidence that is merely cumulative of that already presented does not . . . establish prejudice." *Getsy v. Mitchell*, 495 F.3d 295, 313 (6th Cir. 2007) (en banc) (quoting *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)). Determining what constitutes cumulative evidence can be difficult, as "[o]ur cases . . . do not tell us clearly when evidence becomes sufficiently different to no longer be 'cumulative' or at what level of generality one must compare the evidence." *Vasquez v. Bradshaw*, 345 F. App'x 104, 120 (6th Cir. 2009). Our most frequent formulation of the standard is that "new evidence" is not cumulative if it "differs both in strength and subject matter from the evidence actually presented at [trial]." *Goodwin v. Johnson*, 632 F.3d 301, 327 (6th Cir. 2011).

*England*, 970 F.3d at 714–15.[10] Under the *England* standard, Henry's, Herman's, and Bailey's recountings of the victim's reports to them were plainly cumulative to the victim's testimony. They

---

[10] The Sixth Circuit has found the court of appeals' reasoning persuasive in multiple cases. *See, i.e., Barnes v. Warden, Ross Corr. Inst.,* No. 19-3389, 2019 WL 5576345, at *2 (6th Cir. Sept. 16, 2019) ("Review of the record confirms that Andrews's testimony—whether hearsay or not—was cumulative to Martin's own testimony about the incident. Even assuming the testimony did amount to hearsay, Barnes cannot make a substantial showing that counsel's failure to object resulted in prejudice."); *Dobbs v. Trierweiler,* No. 16-2209, 2017 WL 3725349, at *2 (6th Cir. Apr. 7, 2017) ("[T]he testimony as cumulative with regard to the second shooting . . . [a]nd because the testimony was harmless, Dobbs could not show that his attorney's failure to object to it was objectively unreasonable or that prejudice resulted."); *Thurmond v. Carlton,* 489 F. App'x 834, 842 (6th Cir.

did not materially differ in "strength" or "subject matter" from the victim's trial testimony and there was nothing about the timing or circumstance of the disclosures that lent any meaningful corroborative value to the testimony. Therefore, even if the testimony were "hearsay" testimony, its introduction did not make a difference sufficient to establish *Strickland* prejudice. Put differently, Petitioner has failed to show that the state appellate court's resolution of this claim is contrary to, or an unreasonable application of, clearly established federal law. Therefore, he is not entitled to habeas relief on this claim.

### VIII.   Failure to Properly Handle Expert Witnesses (Habeas Ground I (C))

Petitioner raises several distinct issues under the general category of "failing to properly handle expert witnesses." (Pet'r's Br., ECF No. 16, PageID.617–635.) The principal complaint, however, is counsel's failure to object to expert testimony regarding the victim's credibility. Petitioner also challenges counsel's failure to object to opinion testimony from witnesses who were not qualified or offered as experts. And then Petitioner objects to counsel's questions to the prosecution's expert because those questions elicited information that Petitioner considered damaging.

---

2012) ("Because Baxter's [hearsay] testimony was cumulative to the victim's, the lack of an objection (likely to be sustained) did not prejudice the defense."); *Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) ("[A]dmission [of the hearsay statements] would constitute harmless error because of our conclusion that they did not have a substantial and injurious effect or influence in determining the jury's verdict. . . . Prior to Regina Knox's testimony, there was sufficient corroborating testimony from John Knox and Mary Payne describing the events on the evening of Smith's murder, making Regina Knox's hearsay testimony in this regard cumulative. . . . [H]abeas petitioners are not entitled to relief based on trial error unless they can establish that the error resulted in actual prejudice . . . .").

## A.    Testimony Regarding Credibility

Petitioner contends that the expert testimony offered at trial was, at least in part, objectionable because the experts, Dr. Jim Henry and counselor Tara Herman, testified regarding the victim's credibility. Counsel did not raise that objection.

The Michigan Court of Appeals acknowledged that it is generally improper under state law for a witness to comment on the credibility of another witness. *Barnes*, 2007 WL 1754585, at *7 (stating that "[b]ecause credibility is an issue for the trier of fact, it is improper for a witness to comment on the credibility of another witness"). And the court of appeals noted that the Michigan Supreme Court has identified specific limits on such testimony by experts who testify regarding child abuse. *Id.* (citing *People v. Peterson*, 537 N.W.2d 857 (1995)) ("Our Supreme Court also provided that an expert may not testify that the sexual abuse occurred, may not vouch for the veracity of the victim, and may not testify whether the defendant is guilty.").

The court of appeals concluded that Tara Herman "was not commenting on the victim's credibility as a witness or a victim." *Barnes*, 2007 WL 1754585, at *7. Thus, her testimony was admissible under state law. The court also determined that Dr. Henry's testimony was proper, "with one exception." *Id.*

Whether their testimony was admissible or not under state law, however, is purely a state law issue. As noted above, the state court's determination that the evidence was admissible as a matter of state law is binding on this Court. *See Wainwright*, 464 U.S. at 84; *see also Bradshaw*, 546 U.S. at 76. "[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68. If the evidence is properly admitted under state law, counsel's failure to object would be neither professionally unreasonable nor prejudicial—at least as a matter of state law. *Coley*, 706 F.3d at 752.

Nonetheless, whether the evidence is admissible or not under state law, it is still conceivable that the evidence might so infect the entire trial with unfairness that the resulting conviction violates due process. *See, e.g.*, *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). To obtain habeas relief on the due process claim, however, Petitioner would have to show that the state court's admission of the evidence was in conflict with a decision reached by the Supreme Court on a question of law or that the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Although inconsistency with United States Supreme Court authority is the requirement to establish a foundation for habeas relief for the due process violation, it is not necessarily a requirement to establish that it was professionally unreasonable for counsel to forego the objection. In the state trial court, Petitioner's counsel would not be limited to United States Supreme Court authority in stating an objection to the admission of evidence based on due process.

The lower federal courts offer authority supporting the proposition that opinion testimony regarding the credibility of other witnesses is inappropriate. *See, e.g.*, *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014) (collecting federal circuit court authority); *Esch v. Cnty. of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017) (citing *United States v. Hill*); *Greenwell v. Boatwright*, 184 F.3d 492, 495–97 (6th Cir. 1999) (stating, with regard to the expert's testimony "as to the validity of statements made by other witnesses . . . we agree with the plaintiffs that the expert statements were inadmissible opinion testimony . . . "). But that authority is focused on whether the testimony is permissible under the Federal Rules of Evidence and, even with that non-constitutional focus, there is no Supreme Court authority stating that proposition. *United States v. Hill*, 749 F.3d at 1258

(relying on "the 'weight of authority from other circuits'. . . [in the] absen[ce of] a holding from . . . the Supreme Court").

Moreover, the fundamental premise of much of the lower court authority—that expert testimony regarding witness credibility is inappropriate *because it invades the province of the jury*[11]—has been called into question by the Supreme Court. Interpreting the Federal Rules of Evidence, the Supreme Court in *United States v. Johnson*, 319 U.S. 503 (1943), considered the admissibility of expert testimony that was challenged because it "invaded the jury's province." *Id*. at 519. The Supreme Court was not troubled by the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury. The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury. The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests

---

[11] That is also the premise of the state law limitation on such evidence. Michigan law holds that a witness may not provide an opinion on the credibility of another witness:

> It is "[t]he Anglo-Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses." *United States v. Bailey*, 444 U.S. 394, 414, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Because it is the province of the jury to determine whether "a particular witness spoke the truth or fabricated a cock-and-bull story," *id*. at 414 415, 100 S.Ct. 624, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *People v. Buckey*, 424 Mich. 1, 17, 378 N.W.2d 432 (1985). See also, *People v. Peterson*, 450 Mich. 349, 352, 537 N.W.2d 857 (1995). Such comments have no probative value, *Buckey*, 424 Mich. at 17, 378 N.W.2d 432, because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v. Taft*, 306 Conn. 749, 764, 51 A.3d 988 (2012) (citation and quotation marks omitted). See also, *People v. Row*, 135 Mich. 505, 507, 98 N.W. 13 (1904) (explaining that opinion testimony regarding a complainant's veracity is not competent evidence). As a result, such statements are considered "superfluous" and are "inadmissible lay witness [ ] opinion on the believability of a [witness's] story" because the jury is "in just as good a position to evaluate the [witness's] testimony." *People v. Smith*, 425 Mich. 98, 109, 113, 387 N.W.2d 814 (1986).

*People v. Musser*, 835 N.W.2d 319, 327 (Mich. 2013) (footnote omitted).

for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

*Johnson*, 319 U.S. at 519–20. Federal Rule of Evidence 704(a)[12] expressly states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *Id*. Federal Rule of Evidence 704 was passed for the express purpose of abolishing case law that held witnesses could not express opinions on ultimate issues. Advisory Committee Notes, Fed. R. Evid. 704. In *United States v. Scheffer*, 523 U.S. 303 (1998), in a concurring opinion, Justice Kennedy quoted the Advisory Committee Notes to explain the change:

The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

Even if the Supreme Court concluded that the Federal Rules of Evidence did not allow expert testimony regarding witness credibility, that would not be sufficient to permit habeas relief. Where "the Supreme Court has addressed whether . . . testimony is permissible under the Federal Rules of Evidence . . . [but] it has not explicitly addressed the issue in constitutional terms . . .

---

[12] The parallel Michigan Rule of Evidence is virtually identical. *See* Mich. R. Evid. 704.

there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to,' under the AEDPA." *Bugh*, 329 F.3d at 513. And, more importantly, it would not be professionally unreasonable for counsel to decline to raise an objection to the admission of evidence in a state criminal trial based on the fact that the evidence would violate the Federal Rules of Evidence.

Put simply, whether or not expert opinion testimony regarding witness credibility was properly admitted under state law, or even the Federal Rules of Evidence, is an entirely separate question from whether the evidence violates due process. In light of the United States Supreme Court's decision in *Johnson*, and the express disavowal of the notion that expert testimony on an "ultimate issue" is objectionable, the Court concludes that it was not professionally unreasonable for Petitioner's trial counsel to fail to object to the testimony on federal due process grounds.

Even though counsel's failure to object was not professionally unreasonable with regard to all of the "credibility" testimony that the state courts deemed properly admitted and it was not professionally unreasonable under federal law, that still leaves counsel's failure to object to "credibility" testimony that the state appellate court found to be troublesome under state law. Across all of the "expert" testimony that Petitioner found objectionable, the court of appeals was only troubled by one element in the testimony of one witness.

On appeal, Petitioner challenged many aspects of Dr. Jim Henry's testimony as inappropriate under *People v. Peterson*, 537 N.W.2d 857 (1995). The court of appeals identified only a couple of problematic sentences in Dr. Henry's testimony. The entire exchange that includes those sentences reads as follows:

> Prosecutor: We don't know for sure on that Ping-Pong table today which way Kristyn is going to testify. If she would refuse to testify, would that necessarily invalidate her the accuracy of the initial disclosure?
>
> Dr. Henry: No. And that's consistent with that conflict, that conflicted disclosure. As to looking at my dad and seeing my dad and saying, "I'm going to be the one responsible for him potentially going to jail or being convicted or whatever." And

so we know that children, Especially ones who have experienced this trauma bond, feel responsible for the outcome of the parent.

And so that pressure, enormous pressure to want to be safe, to want to be angry to say I want to be away from this, yet at the other hand, psychologically being so responsible and accommodating, that it vacillates. And it's an enormous amount of pressure for a child to testify to these things because of that internal conflict.

So as I've said this before, in terms of -- in terms of testifying, is that suddenly now they become the betrayer. So the very act of abuse that they were betrayed, they're betraying a parent even though we say to them, tell, that's the right thing to do, it feels like they're betraying because they're the ones that now, in a sense by their testifying, could have that person go to jail for a long time.

Prosecutor: Taking a step further. If it were to occur that she would even say none of this really happened, would that necessarily invalidate the accuracy of the initial disclosure?

Dr. Henry: No, for all the reasons that I just said.

(Trial Tr. II, ECF No. 24-4, PageID.1983–1984.)

The Michigan Court of Appeals found that testimony inappropriate under *Peterson*: "Dr. Henry testified that, if the victim did not testify or if she testified that the sexual abuse never occurred, neither action would invalidate her earlier disclosure of the sexual abuse." *Barnes*, 2007 WL 1754585, at *7. *Peterson* states:

Unless a defendant raises the issue of the particular child victim's postincident behavior or attacks the child's credibility,[13] an expert may not testify that the particular child victim's behavior is consistent with that of a sexually abused child.

_____

[13] The credibility of the victim is attacked when the defendant highlights behaviors exhibited by the victim that are also behaviors within CSAAS and alludes that the victim is incredible because of these behaviors. The scope of the testimony, however, is again limited to the behavior at issue, and the expert may not testify about behavior manifestations that are not at issue. In other words, it does not matter how the behavior trait came into evidence. The expert may not proffer testimony of other behaviors unless the facts as they develop make the specific behavior relevant or if the defendant attacks the victims credibility based on the behavior.

*Peterson*, 537 N.W.2d at 868 & n.13. The court of appeals concluded that "[b]ecause the victim did testify and she testified that defendant sexually abused her, the specific behaviors of her not testifying or of her denying the sexual abuse at trial were not at issue." *Barnes*, 2007 WL 1754585, at *7.

The court of appeals' conclusion regarding state law is, of course, axiomatically correct. *Wainwright*, 464 U.S. at 84; *Bradshaw*, 546 U.S. at 76. But the view of the issue in hindsight is a little clearer than when the testimony was presented. Dr. Henry testified before the victim. The victim had expressed reluctance to testify against her father. The prosecutor did not know what testimony the victim would provide, if any.

When the exchange occurred it was not known what behavior the victim would exhibit. That uncertainty would not foreclose an objection by counsel. If there were two possible, but mutually exclusive, behaviors, one of them would be a behavior that the victim did not exhibit.

The court of appeals concluded that the admission of the testimony contrary to *Peterson* was inconsequential. *Barnes*, 2007 WL 1754585, at *7 ( "[W]e cannot conclude that, but for counsel's failure to object to this improper testimony, there was a reasonable probability that the outcome of defendant's trial would have been different." (citation omitted)). Indeed, that conclusion is almost inescapable. If a behavior that the victim did not exhibit "is consistent with that of a sexually abused child," the fact that the victim did not exhibit the behavior cannot be said to be harmful to Petitioner. That is the very reason the court of appeals concluded that the testimony was "irrelevant." *Id*. If the testimony was unlikely to change the result, it could not be deemed prejudicial. The court of appeals' determination that Petitioner failed to establish this ineffective assistance claim, therefore, is neither contrary to, nor an unreasonable application of *Strickland*, the clearly established federal law regarding ineffective assistance of counsel.

43

**B.      Not Objecting to Opinion Testimony from Witnesses Who Had Not Been Offered as Experts**

Petitioner also claims his counsel mishandled expert testimony by failing to object to opinion testimony from the victim's drug rehabilitation counselor, Tara Herman, and two of the victim's FIA caseworkers, Sandra Leslie and Leslie Barna. The court of appeals resolved Petitioner's claim regarding Herman's testimony one way and the claim regarding witnesses Leslie and Barna another way.

With regard to Herman's testimony, some part of Petitioner's contention that her testimony was improper is centered on his claim that she testified regarding the victim's credibility. That aspect of the claim is considered above in Part VIII.A. But there is another part of Petitioner's claim that focuses on the fact that Herman offered expert opinion without qualification and without objection by counsel. The court of appeals addressed that claim as follows:

> [W]e disagree that [Herman's] testimony was expert testimony. She merely gave a narrative of what occurred in her sessions with the victim. Nothing in her testimony was an opinion that required "scientific, technical, or other specialized knowledge." MRE 702. Accordingly, any objection would have been futile. Counsel is not ineffective for failing to make a futile objection. *Fike*, *supra* at 182.

*Barnes*, 2007 WL 1754585, at *8. The state court's conclusion that Herman's testimony did not fall within the scope of expert opinion testimony under the Michigan Rules of Evidence binds this Court. Therefore, as noted by the court of appeals, the objection urged by Petitioner would have been futile. The court of appeals' rejection of this ineffective assistance claim, therefore, is neither contrary to, nor an unreasonable application of clearly established federal law.

Leslie and Barna were called by Petitioner's counsel. She questioned them regarding the victim's repeated denials of any sexual abuse or drug use during the FIA workers' investigations. Moreover, Petitioner's counsel secured acknowledgements from the witnesses that the victim did

not bear the hallmarks of a person who was addicted to drugs like methamphetamine, as the prosecutor posited.

The prosecutor's cross-examination, however, went in a different direction. The prosecutor asked the witnesses whether, in their experience, denial of sexual abuse by a sexually abused child was unusual, or whether it was unusual for a victim to delay disclosing the abuse until a time when the victim was "safe." (Trial Tr. II, ECF No. 24-4, PageID.2096–2097, 2125.) Barna specifically testified that the victim's lack of disclosure of sexual abuse by Petitioner was not a reliable indicator that the abuse was not occurring, particularly failures to disclose while Petitioner had access to the victim. (*Id.*, PageID.2125–2127.)

The court of appeals concluded that it was not professionally unreasonable for counsel to allow that testimony without posing the objection that it was unqualified expert opinion:

> [A]ssuming that the testimony of the caseworkers was expert testimony, there was sound trial strategy for counsel not to object. If counsel objected and the trial court had declared them expert witnesses, the credibility of the caseworkers may have been heightened in the eyes of the jury. Defendant has failed to overcome the presumption that counsel's failure to object was sound trial strategy. *Sabin*, *supra* at 659.

*Barnes*, 2007 WL 1754585, at *8. The appellate court's logic is unassailable. The witnesses were experienced FIA workers who had dealt with years' worth of abuse complaints. If counsel had objected to the failure to qualify the witnesses as experts, it is unlikely the prosecutor would have just yielded. Instead, he would have qualified them as experts. The prosecutor laid the foundation for that at the beginning of his cross-examination with questions regarding the witnesses' experience. An objection, therefore, would have put Petitioner in a less favorable position: it would have lent more credence to that part of the witnesses' testimony that was unfavorable to Petitioner. The court of appeals' conclusion that foregoing the objection was sound trial strategy is well-

supported by the record and it is neither inconsistent with, nor an unreasonable application of *Strickland*.

### C.      Incompetent Cross-examination of Dr. Henry

Petitioner's final challenge to counsel's handling of the expert witnesses calls into question the professional reasonableness of counsel's cross-examination of Dr. Henry. (Pet'r's Br., ECF No. 16, PageID.632–635.) The cross-examination of Dr. Henry was lengthy compared to the other witnesses. (Trial Tr. II, ECF No. 24-2, PageID.1984–1999.) Petitioner's analysis works backwards in that he combs through Dr. Henry's cross-examination for responses that he did not like and then leaps to the conclusion that one or two of counsel's questions must have been deficient. The court of appeals did not agree:

> Defendant also asserts that counsel was ineffective when she elicited damaging testimony from Dr. Henry on cross-examination. Decisions regarding the questioning of witnesses are presumed to be matters of trial strategy. *People v. Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). We will not substitute our judgment for that of counsel's, *id.*, nor will we assess counsel's competence with the benefit of hindsight, *People v. Garza*, 246 Mich App 251, 255; 631 NW2d 764 (2001). The fact that a chosen strategy may not have worked does not constitute ineffective assistance of counsel. *People v. Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996). Accordingly, simply because defendant did not like the answers Henry gave in response to counsel's questions on cross-examination does not mean counsel's cross-examination fell below an objective standard of reasonableness. *Mack*, *supra* at 129. Defendant has failed to establish his claim for ineffective assistance of counsel.

*Barnes*, 2007 WL 1754585, at *7.

*Strickland* requires the habeas court to indulge a "strong presumption" that counsel's actions fell within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. It is Petitioner's burden to overcome the presumption that the challenged action might be considered sound trial strategy. *Id*. That task is rendered even more difficult by the additional layer of deference owed to the state court's determination that counsel's action were part of a sound strategy. The Supreme Court expressed the nature of that "double deference" in *Harrington*, stating

that the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." 562 U.S. at 105.

In *Harrington*, the issue was whether counsel could have reasonably decided to ***not*** consult a blood expert. The *Harrington* court did not evaluate counsel's decision based on the reasons offered by counsel. Indeed, it does not appear that there was ever a hearing that disclosed counsel's motivation for his decision. Instead, the *Harrington* court considered the reasonableness of the decision in the abstract. That approach necessarily follows from *Strickland*'s requirement that, to overcome the presumption of regularity, the defendant must show that the challenged action ***cannot*** be considered sound trial strategy. If the reviewing court can conceive of a sound strategy that includes the challenged action, the matter is resolved.

The court of appeals did not explain the strategy that might have justified counsel's approach to cross-examining Dr. Henry. After reviewing the entire trial transcript, the strategy is not difficult to discern. The prosecutor painted a picture for the jury of the victim: a teen who had been sexually abused and had become addicted to drugs at Petitioner's hands. Despite years of denials—not just non-disclosure, but adamant denials in response to direct questioning—when the teen was finally in an environment where she was safe, she disclosed the abuse that her made her life unbearable for years.

Defense counsel offered a slightly different perspective. Counsel offered the alternative hypothesis that the victim denied sexual abuse for years because there was no abuse. She was in many different placements over the years, some of those placements appeared to have all of the hallmarks of a "safe" environment; but she did not disclose. Then, the victim was housed in a residential drug treatment program and she wanted to get out. The program required her to make significant admissions regarding drug use, admissions that she resisted at first, but she eventually

yielded. She provided admissions that satisfied her counselor and permitted her to move along in the program, closer to completion and freedom. As she was progressing through the program, she was called into the sheriff's department for an interview regarding allegations of sexual abuse. She resisted disclosure and denied the allegations, but she had learned her lesson and she eventually told her counselor what it seemed everyone wanted to hear regarding the sexual abuse. She was rewarded for that effort. Shortly after the disclosure she completed the program and got a foster placement.

Reviewing the cross-examination of Dr. Henry in the context of the above-discussed narrative casts an entirely different light on counsel's questions. Counsel was able to get Dr. Henry's agreement that the victim was telling the drug rehabilitation counselor the things she needed to say to get out of there. (Trial Tr. II, ECF No. 24-4, PageID.1998–1999.) Dr. Henry specifically agreed that the victim was simply saying what other people wanted her to say. (*Id.*, PageID.1999.)

Counsel pressed Dr. Henry to identify the boundaries of a "safe" environment that would permit disclosure. In response, no matter what counsel described as an environment that appeared to be safe, Dr. Henry would suggest that it was not quite right. Dr. Henry's testimony focused on whether the environment was "safe." Safety, in turn, depended upon whether Petitioner had access or would have access to the victim and whether the victim trusted the person to whom she might disclose the abuse.

Petitioner suggests that Dr. Henry's testimony was damaging, but Petitioner's counsel pointed out, through her questions, that the factors that Dr. Henry described as "safe" were present at other times yet the victim did not disclose. Following the progression of the questions makes it appear as if Dr. Henry were testifying that only the exact set of circumstances that existed when

the victim finally disclosed is the set of circumstances where one might expect disclosure. Essentially it appeared that Dr. Henry was just offering an after-the-fact description of what happened as the only scenario that could have resulted in disclosure. But the disclosure occurred in a police interview room, after extended questioning by an officer, with others observing and recording the event. Considering the "safety" factors that Petitioner's counsel invited Dr. Henry to identify, the environment where disclosure occurred did not seem particularly "safe."

When Petitioner attacks counsel's questions because Dr. Henry, in response, was able to distinguish between the "safe" environment counsel described and a safe environment that would promote disclosure, he is ignoring the strategy that animated his entire defense. Certainly if the jurors credited all of Dr. Henry's testimony, it would not favor Petitioner. But by probing the boundaries of Dr. Henry's definition of a "safe" environment and revealing the "victim is always right" nature of Dr. Henry's testimony, Petitioner's counsel was inviting the jurors to conclude that Dr. Henry's analysis was not particularly insightful and should not be credited.[13]

For these reasons, based on the record, Petitioner has failed to demonstrate that the court of appeals' rejection of this ineffective assistance claim was contrary to, or an unreasonable application of clearly established federal law.

## IX.  Failure to Object to References to Evidence that the Trial Court Had Suppressed (Habeas Ground I(D))

Petitioner reports that the trial court suppressed evidence relating to a pornographic video and magazine, both titled "Barely Legal." (Pet'r's Br., ECF No. 16, PageID.635.) That is not

---

[13] The "victim is always right" nature of Dr. Henry's testimony is perhaps best exemplified by Dr. Henry's statements regarding that which had not yet happened. Dr. Henry effectively stated that if the victim declined to testify at trial that the abuse occurred it would be consistent with the abuse occurring and if the victim testified at trial that the abuse occurred it would be consistent with the abuse occurring.

accurate. The court suppressed the video and the magazine; but the court concluded that the victim could testify that she was shown the sexually explicit material, and the officer could testify that he found the sexually explicit material, thereby corroborating the victim's testimony. (Trial Tr. I, ECF No. 24-2, PageID.1898–1899.) In the order reflecting that ruling, the parties agreed that the prosecutor would have to lay the foundation for the officer's testimony through the victim or one of her counselors. (*Id.*, PageID.1899–1900.)

During opening argument, the prosecutor told the jurors that the victim would testify that she had viewed the "Barely Legal" videotape and "Barely Legal" magazine with her father and that the officer would testify that he found those materials in the motel room. (Trial Tr. II, ECF No. 24-4, PageID.1953.) Petitioner contends that the argument violated the trial court's ruling. The court of appeals disagreed:

> Defendant next argues that counsel was ineffective for failing to object or to move for a mistrial when the prosecutor, in his opening argument and examination of a police officer, improperly used the evidence of the magazine and videotape. While the trial court suppressed the "Barely Legal" videotape and magazine themselves, it ruled that the victim could testify about them. It also allowed the police officers to testify about the videotape and magazine in order to corroborate the victim's testimony. In his opening statement, however, the prosecutor informed the jury that the victim would testify that defendant would show her the "Barely Legal" videotape and magazine and that the officer who searched defendant's motel room would testify that he discovered a "Barely Legal" videotape and magazine in defendant's hotel room. We conclude that any objection to the prosecutor's opening statement would have been futile. It comported with the trial court's order. Counsel is not ineffective for failing to make a futile objection. *Fike*, *supra* at 182.

*Barnes*, 2007 WL 1754585, at *5. The appellate court's interpretation of the trial court's order is a state law issue and, therefore, binds this Court. The appellate court's further conclusion that any objection would have been futile, such that a failure to raise the objection was not ineffective assistance, is entirely consistent with clearly established federal law.

Petitioner next complains that counsel rendered ineffective assistance because she failed to object when the police officer testified that the females pictured on the video package and the

magazine looked like girls as opposed to teenagers or adults. (Trial Tr. II, ECF No. 24-4, PageID.2064.) The appellate court did not decide whether that testimony went beyond the scope of the trial court's order. Instead, the court concluded that counsel had a strategic reason to not object: she did not want to draw any further attention to the details of the pornographic materials. *Barnes*, 2007 WL 1754585, at *6.

Petitioner takes issue with that determination. He contends that if that strategy sufficed to excuse failure to object, every failure to object would be excusable on strategic grounds. Petitioner invites this Court to consider *de novo* the issue the court of appeals did not reach: prejudice.

The Court concludes that Petitioner has failed to show that counsel's failure to object to the testimony had any effect on the judgment. Before stating that the depicted females looked like girls, the officer acknowledged that they were, in reality, adults. (Trial Tr. II, ECF No. 24-4, PageID.2064.) Moreover, before the jurors heard the officer's opinion that the actors looked like girls, they already heard testimony that Petitioner regularly viewed these pornographic materials with the victim before he sexually assaulted her. The jurors also heard the title of the video and magazine: "Barely Legal." That title alone implies that the content would include sexual situations among adult actors that appeared as if they were very young—according to the title, just old enough to legally participate in such a production.

Petitioner claims that he was prejudiced, meaning that the officer's statement likely changed the result. To prevail Petitioner would have to show:

- that the jurors were untroubled by Petitioner's viewing of pornography with his daughter as a precursor to sexual assault;

- and the jurors were untroubled that the particular pornography was marketed as displaying sexual situations involving adults who appear to be just beyond the legal age to participate in those activities; but

- those same jurors were likely be swayed to convict because the officer said that the female participants looked like "girls."

That position is patently absurd.

Petitioner has failed to demonstrate that the appellate court's determination that counsel's failure to object was strategic is contrary to, or an unreasonable application of clearly established federal law. And even if the failure to object were professionally unreasonable, this Court finds that Petitioner has failed to demonstrate any prejudice resulting from the officer's testimony.

Petitioner then complains that the same testimony should have prompted counsel to seek a mistrial. The court of appeals rejected that claim because a mistrial is only appropriate "where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *Barnes*, 2007 WL 1754585, at *6. The court of appeals concluded that if the comments resulted in any prejudice, a jury instruction could have cured it. Therefore, the court reasoned, a motion for mistrial would have been futile. As noted several times already, failure to raise a meritless objection or motion is neither professionally unreasonable nor prejudicial. The court of appeals determination, therefore, is entirely consistent with clearly established federal law and habeas relief is not warranted.

## X.    Failure to Challenge Petitioner's Statement as the Fruit of the "Barely Legal" Poisonous Tree (Habeas Ground I (G)(iii))

Petitioner presents a hybrid issue that involves a challenge to the admission of Petitioner's interview statement—as also challenged in habeas grounds I (A) and I (G)(i) and (ii)—because the statement was prompted by confronting Petitioner with the "Barely Legal" videotape and "Barely Legal" magazine—as also challenged in habeas ground I (D). Petitioner argues:

> Confessions made after police confront a suspect with evidence obtained through an illegal search and seizure are the fruits of the poisonous tree and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). "The *Wong Sun* doctrine applies . . . when the fruit of a Fourth Amendment violation is a confession." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). "[T]he prosecution must

show a sufficient break in events to undermine the inference that the confession as caused by the Fourth Amendment violation." *Id.*

(Pet'r's Br., ECF No. 16, PageID.696.) Petitioner presented this argument to the Michigan Court of Appeals on direct appeal.

> The court of appeals rejected Petitioner's claim:
>
> [W]hen the police, pursuant to a search warrant, searched defendant's motel room, they discovered and seized a Hustler videotape and magazine both entitled "Barely Legal." The trial court suppressed the videotape and magazine on the basis that they exceeded the scope of the search warrant. Defendant argues that, because he was confronted with the "Barely Legal" magazine before he made his post-arrest statement, his statement was fruit of the poisonous tree and counsel was ineffective for failing to move to suppress defendant's post-arrest statement. However, the record provides no indication that defendant was ever confronted with the "Barely Legal" magazine. Thus, because defendant has failed to establish the factual predicate of his claim for ineffective assistance of counsel, *People v. Hoag*, 460 Mich. 1, 6; 594 NW2d 57 (1999), defendant has failed to establish that counsel's failure to move to suppress his post-arrest statement on the basis that it was fruit of the poisonous tree fell below an objective standard of reasonableness. *Mack, supra* at 129.

*Barnes*, 2007 WL 1754585, at *5. At the time of Petitioner's direct appeal, the record evidence regarding Petitioner's interview was Detective Mohney's testimony. That testimony included no information regarding confronting Petitioner with the "Barely Legal" magazine.

As explained above, § 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180. "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable," then this Court is not so limited. In this instance, however, Petitioner has not shown that the state court record before the court of appeals on his direct appeal did not support the court of appeals' determination. Thus, this Court cannot go beyond the testimony of Detective Mohney in evaluating the claim.

Petitioner contends that this Court can go beyond the limited record available to the court of appeals in 2007. Petitioner notes that the trial court admitted the videotape of Petitioner's interview into the record as part of the proceedings on Petitioner's motion for relief from judgment. But *Cullen* makes clear that the limit is not just the state court record, it is "the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180. That record did not include the videotape (or Petitioner's transcription of its content). Accordingly, Petitioner has failed to show that the court of appeals' rejection of the claim is based upon an unreasonable determination of the facts based upon the record before the court or that the rejection is contrary to, or an unreasonable application of, clearly established federal law.

## XI.     Failure to Call a Forensic Interviewing Protocol Expert (Habeas Ground I (E))

Petitioner next faults counsel for failing to consult with or call a forensic interviewing protocol expert. Petitioner raised this iteration of his ineffective assistance claim[14] for the first time in his motion for relief from judgment. Counsel was appointed to represent Petitioner in presenting his motion. The court conducted an evidentiary hearing, taking testimony from Petitioner's proposed expert, Petitioner's trial counsel, and Petitioner's appellate counsel. (Apr. 17, 2014, Hr'g Tr., ECF No. 24-17.) The trial court rendered its decision on the record. (Dec. 17, 2019, Hr'g Tr., ECF No. 24-18.)

---

[14] He raised a similar, but broader, claim on direct appeal—that counsel had failed to call an expert witness to refute Dr. Henry's testimony. *Barnes*, 2007 WL 1754585, at *8. The court of appeals rejected that claim because there was no evidence that such expert testimony was available or that the lack of such testimony deprived Petitioner of a substantial defense. *Id*. at *9. Because Dr. Henry did not specifically testify regarding the forensic interview protocol, the Court concludes that the claim relating to the forensic interviewing protocol raised in Petitioner's motion for relief from judgment is a different claim than the ineffective assistance/expert witness claim Petitioner raised on direct appeal.

The crux of Petitioner's proposed expert's testimony was that the interview that resulted in the victim's first disclosure was not conducted in accordance with the forensic interviewing protocol. (May 4, 2016, Opinion of Ira J. Schaer, Ph.D., ECF No. 24-15, PageID.2439–2456.) The expert opined that the disclosure was, therefore, tainted. The expert went so far as to say that the victim "was essentially brainwashed into admitting that her father was culpable . . . ." (Apr. 17, 2014, Hr'g Tr., ECF No. 24-17, PageID.2591.)

The trial court concluded that the proposed expert's opinion would not have been permitted, for a number of reasons. First, the court stated that the expert's opinion smacked of "presentism . . . applying today's standards and facts to something that happened in history and trying to make the argument that they were wrong 15 years ago for what they were doing because of today's standards." (Dec. 17, 2019, Hr'g Tr., ECF No. 24-18, PageID.2668.) The court concluded further that the expert, at least in part, "was just wrong in his analysis." (*Id.*, PageID.2670.) For example, the expert testified that the second edition of the interview protocol would have applied at the time of the interview when, in fact, it would have been the first edition. (*Id.*, PageID.2670–2671.)[15] The court noted that the expert overstated some of the requirements of the protocol. (*Id.*, PageID.2671–2672.) The court also indicated that the expert's description of the interplay between the officer and the counselor as "good cop, bad cop" was a mischaracterization. (*Id.*, PageID.2674–2675.) Finally, the court described the expert's statement that nothing the victim said after the interview could be believed because the interview had brainwashed her as pure conjecture lacking any foundation. (*Id.*, PageID.2675–2676.)

---

[15] During the evidentiary hearing, on cross-examination, Dr. Schaer admitted that he did not know what was on the initial protocol. (Apr. 17, 2014, Hr'g Tr., ECF No. 24-17, PageID.2600–2601.) He "couldn't get hold of it." (*Id.*, PageID.2601.) The expert's testimony, therefore, was based on the protocol in effect after the interview and the trial. (*Id.*, PageID.2602.)

For all of those reasons, the court indicated that the expert would not have been allowed to testify. The court of appeals denied leave to appeal that determination concluding that Petitioner had failed to establish that the trial court erred. (Mich. Ct. App. Order, ECF No. 24-37, PageID.5031.) That state-law determination, that the testimony would not have been admissible under the Michigan Rules of Evidence, binds this Court.

Because the expert testimony would not have been allowed, Petitioner cannot establish that he was prejudiced by counsel's failure to make the attempt. It would have been futile. Therefore, Petitioner cannot prevail on his ineffective assistance claim.

But the trial court also indicated that the claim failed on the first prong. The court indicated that during 2003, when the interview took place, and 2004, when Petitioner was tried, the idea that non-compliance with the forensic interview protocol was a viable subject for expert testimony was novel. Raising the issue was certainly not commonplace. At the time of Petitioner's trial there were no published Michigan appellate cases that even mentioned "forensic interview protocol," and there were only two unpublished court of appeals cases. *See People v. Warnke*, No. 240369, 2003 WL 21958216 (Mich. Ct. App. Aug. 14, 2003); *People v. Vanlandingham*, No. 241311, 2003 WL 22850027 (Mich. Ct. App. Dec. 2, 2003).

That is consistent with Petitioner's trial counsel's testimony. She stated: "[W]e know a lot more now than we did in 2003. I mean, there's a lot more case law. There's a lot more in terms of the updates of the protocol." (Apr. 17, 2018, Hr'g Tr., ECF No. 24-17, PageID.2644.) Counsel indicated that she had consulted with and called experts regarding the protocol more recently. (*Id.*, PageID.2650.) But her more recent efforts followed from the fact that "there's more and more literature out there now indicating that there's people available to do that. At the time [of trial], not so much." (*Id.*; *see also* PageID.2657–2658.) Counsel testified that it was not common practice at

that time to consult with an expert regarding the protocol; she was not even certain that there was anyone in the area at that time with whom she could have consulted. (*Id.*, PageID.2650–2651.) Counsel indicated she was aware of the protocol at that time and she was aware of its purpose. (*Id.*, PageID.2654.) She did not explore expert assistance because, by the time of trial, the victim had made multiple disclosures and because her client had viewed the purportedly tainted disclosures and admitted they were true. (*Id.*, PageID.2657–2659.)

Petitioner does not squarely address the factual or legal foundation for the trial court's rejection of the claim. He simply relies on the very favorable opinion of Dr. Schaer without addressing (1) the determination that the opinion was not admissible or (2) the testimony that a "forensic interview protocol" challenge in 2003 was a novel and, essentially, untested defense tactic, and particularly inappropriate given Petitioner's admissions. (Pet'r's Br., ECF No. 16, PageID.640–643, 645–666.) That does not mean that Petitioner fails to attack the state court's analysis or conclusion.

Petitioner first attacks the trial court's comment regarding "presentism." (*Id.*, PageID.645.) Petitioner suggests that the comment regarding presentism relates to the court's mention of the Michigan Supreme Court's decision in *People v. Kennedy*, 917 N.W.2d 355 (Mich. 2018). *Kennedy*, a relatively recent decision at the time of the trial court's bench opinion, held that the decision whether or not to fund defense requests for the appointment of expert assistance should be evaluated based upon the requirements of due process as set forth in the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985). The *Kennedy* decision was a departure from the existing standard in Michigan which looked to different requirements, requirements that were spelled out in Mich. Comp. Laws § 775.15, *People v. Jacobsen*, 532 N.W.2d 838 (Mich. 1995), and *People v. Tanner*, 671 N.W.2d 728 (Mich. 2003). Petitioner posits that the trial court

57

was suggesting that the matter should be resolved under the pre-*Kennedy* standard in place at the time of the trial, not the *Kennedy* standard.

Petitioner's interpretation of the "presentism" comment is strained. Neither *Kennedy*, *Ake*, *Jacobsen*, *Tanner*, nor the state statute have any relevance to the court's ultimate decision. The trial court was not deciding whether the state was obligated to fund Schaer's testimony; the court was considering whether it would allow jurors to hear Schaer's opinion as expert testimony. The court concluded that it would not allow the testimony as expert testimony because it was not well-founded—it relied on protocols that did not exist at the time of the interview and it was speculative, conjectural, and extreme.

Thus, the significantly more sensible interpretation of the trial court's reference to "presentism" is that the trial court was criticizing Schaer's evaluation of the victim's interviewers based on an interview protocol that did not even exist when the interviews occurred and also challenging Petitioner's criticism of his trial counsel's 2004 decision to not call an forensic interview protocol expert based on the law as it developed in the fifteen years after counsel made the decision. *Strickland* specifically warns against that sort of 20/20 hindsight: "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. "Counsel's failure to advance a novel legal theory cannot support a claim of ineffective assistance of counsel under *Strickland*." *Whetstone v. United States*, No. 1:17-CV-507, 2018 WL 2984690, at *3 (W.D. Mich. Jun. 14, 2018) (citing cases). Even Petitioner acknowledges that "as a general matter, counsel has no duty to present novel theories or arguments." (Pet'r's Br., ECF No. 16, PageID.647.)

Petitioner goes on to recount all of Dr. Schaer's testimony and then claims the same arguments could have been made in 2003 or 2004. That is beyond dispute. But the question is not "could the arguments have been made," the question is "was counsel professionally unreasonable for failing to make them." Dr. Schaer's testimony was not particularly helpful in answering that question. Petitioner points out that Dr. Schaer testified the changes from one protocol edition to the next were "quite minor." (*Id.*, PageID.646.) But Petitioner ignores the fact that Dr. Schaer ultimately conceded that he never actually looked at the first edition of the protocol—the operative edition at the relevant time.

The trial court questioned Dr. Schaer's testimony that a forensic interview should never be done at a police station. The court looked at the protocol and concluded that was an overstatement. Petitioner contends that was an unreasonable determination of the facts; but the only support he provides is Dr. Schaer's testimony, testimony offered without ever reviewing the protocol at issue when the interview occurred. (*Id.*, PageID.648–649.)

Petitioner challenged the trial court's implication that forensic interviews were not conducted in St. Joseph County in 2003. (*Id.*, ECF No. 16, PageID.649.) The trial court neither stated nor implied such a fact. The trial court stated that St. Joseph County did not have its own children's trauma assessment center until 2018.

Petitioner challenged the trial court's determination that Dr. Schaer testified that nothing the victim said could be believed. (*Id.*, PageID.649–654.) Petitioner then offers an extensive quotation for Dr. Schaer's testimony that completely undercuts Petitioner's position. Dr. Schaer testified that the victim was brainwashed into admitting that her father was culpable, it would be impossible for a false memory not to be created by the interview, and if the protocol was not

followed everything is called into question and nothing can be taken as truth. The trial court's interpretation of Dr. Schaer's testimony is well-supported by the record.

That accounts for the first four of Petitioner's numbered "reasons" why the trial court was wrong. Petitioner offers four more. (Pet'r's Br., ECF No. 16, PageID.654–666.) They follow the same pattern. Petitioner offers a skewed view of the record but he never demonstrates that the trial court made an unreasonable determination of fact. This Court finds specifically that the factual determinations upon which the trial court based its conclusion, as set forth above, are well-supported by the record. Petitioner never addresses the trial court's ultimate conclusion regarding the reasonableness of counsel's decision to not challenge the procedural validity of disclosures that Petitioner admitted. That conclusion is neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief.

## XII.   Failure to Obtain Evidence Necessary for Trial to be Timely Held and Failure to Take Actions to Support the Strategically Chosen Defense (Habeas Grounds (I)(G)(iv) and (v))

Petitioner's next two ineffective assistance of trial counsel claims are absolute flights of fancy.

The first claim—based on counsel's failure to obtain evidence to permit a timely trial—entirely depends upon the court suppressing Petitioner's statement to police and the accuracy of Petitioner's speculation that the victim would not have testified if counsel would have permitted trial to go forward in the fall of 2003. Petitioner contends that the trial court, when considering Petitioner's motion for relief from judgment, refused to take up the claim because it determined the claim had been decided on direct appeal as part of the "speedy trial" claim. That, Petitioner claims, would open the door for this Court's *de novo* review of the claim.

The logical fallacy of Petitioner's claim is that if, in fact, counsel knew that the victim would not testify and Petitioner's confession would be suppressed, there would have been no need

to obtain the FIA evidence showing that the victim had previously denied that Petitioner sexually assaulted her. Counsel's shortcoming, then, was not the fact that she did not timely obtain the FIA evidence, it was counsel's failure to omnisciently discern that the victim would not testify and the confession would be suppressed.

There is no record support for Petitioner's wishful, fictional account of where matters stood in the fall of 2003.

Petitioner's claim that counsel failed to take actions to support the strategically chosen defense fares no better. The crux of the claim is that Petitioner's counsel did not do enough to convince the jurors that the victim wanted to get out of drug rehab so much that she would say anything. The Court's review of the record indicates exactly the opposite. It was very apparently counsel's strategy to emphasize that it was the victim's main goal to leave rehab and that she would say whatever it took to achieve that goal. Counsel supported that strategy in her cross-examination of Dr. Henry, the victim, and the victim's drug rehab counselor—every witness who might have had insight into the victim's goal to get out of drug rehab.

Petitioner faults counsel for not presenting evidence such as Petitioner's brief exhibit GG. That exhibit states expressly that "[the victim] will do what she needs to get out of the rehab program." (ECF No. 16-14, PageID.923.) It is not clear who authored that handwritten note, to whom it was addressed, or its purpose. Petitioner has failed to lay any foundation for the admissibility of the note. It does not show up anywhere in the court record until Petitioner's motion for relief from judgment. Petitioner suggests it was a note from the rehab facility to the police. (ECF No. 24-37, PageID.5084.) Whatever the source, at best, the note would have echoed the testimony Petitioner's counsel secured from the witnesses.

The Court concludes that Petitioner has failed to show that counsel's approach to the issue of the victim's motivation was professionally unreasonable. To the contrary, the Court concludes that counsel ably defended Petitioner and ably presented the very issue that is the subject of Petitioner's argument. Moreover, to the extent a failure to introduce the note was professionally unreasonable, the Court concludes there was no prejudice because the evidence would have been cumulative of the testimony offered by other witnesses.

In short, Petitioner has failed to establish that counsel rendered ineffective assistance under the *Strickland* standard.

## XIII. Failure to Show that Petitioner was Guilty of Only Count V—CSC-II (Habeas Ground I (H))

Petitioner's next ineffective assistance claim also depends on a skewed view of the record. Essentially Petitioner claims that if counsel had presented testimony like Dr. Shaer's to compel the rejection of the victim's interview and then urged the proper interpretation of the sister's testimony and Petitioner's interview admissions—that being a restrictive interpretation that admitted only sexual touching—then the evidence would have only supported convicting Petitioner of CSC-II. Effectively, Petitioner contends that if his counsel had succeeded in excluding all of the evidence of his CSC-I crimes, then he only would have been found guilty of CSC-II.

Petitioner's wishful thinking falls far short of demonstrating that counsel's actions were not professionally reasonable. Again, under *Strickland*, Petitioner has failed to establish that his counsel rendered ineffective assistance.

## XIV.   Appellate Counsel's Failure to Raise the Issues Presented Above (Habeas Grounds IV and V)

Finally, Petitioner complains that appellate counsel rendered ineffective assistance of appellate counsel for appellate counsel's failure to raise the issues Petitioner presents above (habeas ground IV), specifically identified as habeas claims I(E) through III (habeas ground V).

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 287–88 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id*. at 288.

As set forth in detail above, all of the issues Petitioner claims that appellate counsel should have raised have no merit. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley*, 706 F.3d at 752. Petitioner has failed to demonstrate that appellate counsel rendered ineffective assistance under the *Strickland* standard.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth

Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

The Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that the denial of Petitioner's claims would be debatable or wrong. Therefore, the Court denies Petitioner a certificate of appealability.

Moreover, for all of the reasons the Court concludes that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, the Court also concludes that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment denying the petition and an order denying a certificate of appealability and Petitioner's motion to expand the record.

Dated:      March 28, 2023                          /s/ Robert J. Jonker
                                                    Robert J. Jonker
                                                    United States District Judge